# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TENNESSEE
# KNOXVILLE DIVISION

| | |
|---|---|
| JOHN TSOURIS, | ) |
| | ) |
| Plaintiff, | ) No. 3-09-cv-522 |
| | ) |
| v. | ) JUDGE: VARLAN |
| | ) MAGISTRATE JUDGE: SHIRLEY |
| | ) |
| THE SHAW GROUP, INC., and | ) |
| SHAW ENVIRONMENTAL, INC. | ) |
| | ) |
| Defendants. | ) |

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff John Tsouris submits the following response in opposition to Defendants' Motion for Summary Judgment and accompanying memorandum (Docket Entry No. 30-31).

## STATEMENT OF FACTS

Plaintiff, John Tsouris, became employed by Defendants (hereinafter referred to as "Shaw") as a field service technician in early 2006. See Tsouris Depo. at pp. 7-8. His job duties included traveling from his home in North Carolina to customer work sites, and maintaining, repairing, installing and performing tests on continuous emissions monitoring systems. See Tsouris Depo. at pp. 17-18.

Prior to working at Shaw, he worked at a company named ESC. See Tsouris Depo. at p. 40. While working as a field service technician at ESC, he made several complaints to his supervisor concerning the fact that he was not paid overtime. See id. However, when Shaw purchased the division of ESC in which Tsouris worked, Tsouris believed that Shaw would be fully aware of federal law and that field service employees who were not being paid overtime would finally be paid overtime. See id. at p. 41.

Tsouris notified management at Shaw about his belief that he was misclassified as "exempt" under the FLSA very early in his employment with Shaw. See id. at pp. 41-45. Each of Tsouris' supervisors had a slightly different response to his overtime complaints. See id. at p. 41, ln. 16-17. In early 2006, Tsouris discussed his concerns about overtime and misclassification between three and five times with his first Shaw supervisor, Zach Massengill. See id. at pp. 47-48. Massengill informed Tsouris that he wasn't eligible for overtime because of the type of job he had, that people's pay scales were too high to receive overtime, and that there was nothing that Massengill could do about it. See id. at p. 46.

When Don Dinkins took over from Massengill as Tsouris' supervisor, Tsouris discussed matters of overtime and misclassification at length with Dinkins. See id. at pp. 56-57. Dinkins told Tsouris that he was not eligible for overtime, that he was being overpaid, and that his specific job classification would, in the future, be eligible for higher top pay than some of the other people in the department. See id. at pp. 59-60. Tsouris, who continued to believe that he was entitled to federally mandated overtime, was completely unsatisfied by the response of Dinkins and lost confidence that Dinkins was properly addressing his overtime concerns. See id. at pp. 56-57. On March 9, 2006, Tsouris sent an email to another Shaw manager, Bob Howard, in which Tsouris detailed provisions from the Department of Labor's on-line compliance section that addressed "Blue Collar Workers" and their status under the FLSA. See March 9, 2006 email, Bates Stamped Tsouris 0269-270, (attached as Exhibit A). Less than two weeks later, on March 20, 2006, Tsouris sent an email to Don Dinkins, stating, in part:

> As for the overtime, I don't care that a field service category maxes out at 65K pay as it will take me years to reach that level of pay, assuming we even get raises yearly.

2

> I want categorized as a field service technician as it should be (sic). In fact, according to the US DOL, skilled blue collar workers that use their hands in their work cannot be classified as exempt.
>
> *This issue will not go away until I see time and a half for overtime worked.*

See March 20, 2006 email, Tsouris 0273 (attached as part of collective Exhibit B) (emphasis added). See also Tsouris Depo. pp. 56-57.

Dinkins responded to Tsouris complaints, stating, in part:

> I have no way to change this and if you are put on the technician rate, I do not even know if they will pay you the same rate because of time and a half overtime. They may ask you to take a cut in pay because of going to time and a half overtime. All the technicians in our group are classified as white collar workers, because we are listed as consultants. This is the way I understand that Shaw does business.

See Dinkins response to March 20, 2006 email, Tsouris 0272 (attached as part of collective Exhibit B).

In approximately mid-2007, John Rymer became Tsouris' direct supervisor. See Tsouris Depo. at pp. 11-12. On July 17, 2007, after Charles Jones became Tsouris' new business line manager (Rymer's supervisor), Jones sent an email to Tsouris commending him for doing a great job and used Tsouris as an example of what Jones expected from his service group by carbon copying the email to other field service technicians. See July 17, 2007 email from Jones, Jones Exhibit No. 3 (attached as Exhibit C); Jones Depo. at p. 53. Around one month later, on or about August 10, 2007, Tsouris spoke in-person with Jones to discuss issues he had with Shaw's overtime policies and his classification status under the FLSA. See Jones Depo. at pp. 65-67, 78. Tsouris "opened the eyes" of Jones to Shaw's overtime and misclassification issues under the FLSA. See Jones Depo. at pp. 62, 65-67, 78. After the August 10, 2007 meeting, Jones, Rymer and members of Shaw's Human Resources department discussed issues of overtime and/or

3

classification "probably on almost a daily or every other day discussion until the matter was solved." See Jones Depo. at p. 77.

In an August 20, 2007, email Jones confirmed a directive from John Rymer that Tsouris should ignore a previous email that was sent regarding an overtime issue. See Jones Exhibit No. 4, Rymer Exhibit No. 5 (attached as Exhibit D). During August and September, Tsouris brought up overtime issues to Rymer and Jones. See Tsouris Depo. at p. 69. Jones made it clear to Tsouris that he was upset about the fact that Tsouris had raised the overtime issue and stated that he could not afford to pay him if Shaw had to pay him overtime. See Tsouris Depo. at p. 100. Jones also told Tsouris that he didn't like that Tsouris was pushing him over the overtime issue and that he was going to push back. See Tsouris Depo. at p. 101.

Towards the end of September 2007, Tsouris informed Jones and Rymer that he was taking his issues with overtime and misclassification to the HR Department. See id. at pp. 69, 92. On October 8, 2007, he sent an email to Fran Sarvas, Shaw's Senior Manager of Human Resources, formally requesting a review of his classification as an exempt employee. See October 8, 2007 email, Exhibit 5 to Tsouris Deposition (attached as Exhibit E). Tsouris continued to bring up classification/overtime issues in October, November and December of 2007. See Tsouris Depo. at p. 69.

Approximately two months after Tsouris' formal request of Fran Sarvas and HR to review his classification as an exempt employee, on Friday, December 14, Sarvas sent an email to a number of Shaw management employees regarding "FLSA issues that need to be resolved ASAP." See Jones Exhibit No. 6, Rymer Exhibit No. 10, Defendant's Bates Stamp 234 (email string attached in its entirety as Exhibit F). The email stated, in part:

4

> Based on discussions Sommer, Randy Jones, John Rymer and I have had, we have agreed that if we change their FLSA status from exempt to non-exempt, we want to make sure that we back pay them any overtime and a half rate. It is my understanding that they were paid straight time for any overtime they worked. One of the employees, **John Tsouris, has raised this issue and has told management that if we do not fix this, he will get an attorney or he may go directly to the Department of Labor.** John has also raised this issue with me. We don't want this to happen so we need to be ready to pay this overtime as soon as the FLSA status is approved to be changed.

See id. (Emphasis added).

Five days later, on Wednesday, December 19, 2007, Sarvas wrote an email noting a conference call she had with Charles Jones and John Rymer about FLSA classification issues and that "management and HR had a discussion with John Tsouris indicating that we would review this matter and get back to him." See December 19, 2007 email, Defendants' Bates Stamp 241, (attached as Exhibit G). In a separate email sent that day, Lisa Brandon, Vice-President of Engineering, approved the reclassification of Tsouris and other employees, and stated that "Shaw E & I must continue to be in compliance with all labor laws and regulations, and if we made an error, we need to proactively correct this error, and then train those involved so that this does not happen again." See December 19, 2007, email, attached as Defendants' Bates Stamp 240 (attached as Exhibit H). In that email, Ms. Brandon also stated that, based upon Shaw's classification slotting errors, she was requiring a training program be developed and implemented for the hiring of managers and supervisors that specifically focused on exempt and non-exempt labor categories. See id.

On that same day, **December 19, 2007**, Charles Jones wrote an email to Fran Sarvas and John Rymer which states, in part:

> **I need an Exit package for John Tsouris**…. This individual is causing major conflicts with my team and client schedules.

5

> He is a loose cannon….. I will only have my Blackberry today as I will be working in the field. John Rymer is putting all correspondence and there the lack of, together for you (sic).

See December 19, 2007 email from Jones to Sarvas and Rymer, Jones Exhibit No. 10, Rymer Exhibit No. 9 (attached as <u>Exhibit I</u>) (emphasis added).

Aware that Tsouris was going to be traveling to Pittsburgh to spend the week of Christmas with his family[1] (<u>see</u> Tsouris Depo. at p. 177), on Thursday, December 20, 2007, Rymer threatened Tsouris to "Give me a reason to fire you" and noted that he was "fixing to fire" Tsouris. <u>See</u> Tsouris Depo. at p. 83. Rymer emailed Tsouris on the evening of December 20, 2007, assigning him to be on site in North Carolina on December 27th and 28th, and informing him that he needed to complete all remaining trip reports/workbooks on Christmas Eve and December 26, 2007. <u>See</u> Defendant's Bates Stamp 100, Jones Exhibit No. 8, Rymer Exhibit No. 6 (attached as part of collective <u>Exhibit J</u>). Rymer copied Jones on this email request, even though, according to the testimony of Jones, he was "not typically" copied on assignment requests for field service technicians. <u>See</u> Jones Depo. at p. 93.

On 12:14 a.m. on Friday, December 21, 2007, Tsouris responded to Rymer via email, and copied Charles Jones. <u>See id</u>. Tsouris' email stated, in part:

Hello.

I am in receipt of this assignment.

As I have previously discussed with you about three times now, I will be in Pittsburgh next week as this week was indicated as holiday for the entire year.

---

[1] Although Tsouris did not make a written request for vacation during the week of Christmas, Rymer was aware that Tsouris was in Pittsburgh seeing family the week of Christmas. <u>See</u> Tsouris Depo. at pp. 177-178. Previously, if Tsouris or other employees had a period of time where they needed some time off, it was up to them to take the time off. <u>See</u> Tsouris Depo. at p. 176. Tsouris would submit a formal, written request for vacation if he was going to travel outside the country, but only did that around "50 percent of the time." <u>See id</u>. In fact, he had never made a formal or written request for time off the week of Christmas. <u>See id</u>.

6

> As such, *I will take an airline flight next Wednesday to complete the critical assignment at Duke*, return by airline, with a rental car in between.

See Defendants' Bates Stamp 100, Jones Exhibit No. 8, Rymer Exhibit No. 6 (attached as part of collective Exhibit J) (emphasis added). That day, Tsouris was working on a Shaw site in Pittsburgh. See Tsouris Depo. at p. 84.

On Christmas Day of 2007, Jones terminated Tsouris via email. See Jones Exhibit No. 9, Defendant's Bates Stamp 13 (attached as Exhibit K). In the email, Jones states that he was terminating Tsouris because he refused to dispatch to a job assigned to him on December 20, 2007. See id. The email also stated that Rymer refused to approve Tsouris' airfare from Pittsburgh to North Carolina (the assigned location) and that Tsouris had "no vacation or personal time requested on record."[2] See id.

Jones fired Tsouris despite giving Tsouris the following ratings in his 2007 written performance review:

1. Top 15-20% of all employees in "knowledge/job skill"
2. Top 15-20% of all employees in "quality of work"
3. Top 15-20% of all employees in "attitude/cooperation"
4. Top 5-10 % of all employees in "safety"
5. Top 15-20% of all employees in "dependability"
6. Top 5-10 % of all employees in "compliance/ethics"

See 2007 Employee Performance Management Program Final Review of John Tsouris, Rymer Exhibit No. 1, Jones Exhibit No. 1, (attached as Exhibit L).

Tsouris was first informed by Shaw that he was entitled to federally mandated overtime on December 26, 2007, the day after he was terminated. See Tsouris Depo. at p. 65.

---

[2] When Rymer ultimately refused to pay for Tsouris to take a plane to the North Carolina job, Tsouris told Rymer that the company had always reimbursed travel expenses and questioned why they wouldn't do it in this instance. See Tsouris Depo. at p. 82. The standard, well-accepted policy of the company was that if you were in a personal location or a business location away from your home, you could take any method of transport you wanted to get to the customer site and it would be paid for. See Tsouris Depo. at p. 85. In fact, Tsouris had previously been at a personal location away from home when business came up and Shaw paid for it without him needing to even get an approval for it in advance. See Tsouris Depo. at pp. 85., 87-88

## STANDARD OF REVIEW

The only question currently before this Court is a question that Shaw ignores in its Motion for Summary Judgment: when taking the evidence in the light most favorable to Tsouris, can Shaw prove that there is no genuine issue as to any material fact and that Shaw is entitled to judgment as a matter of law? See La Quinta Corp. v. Heartland Props. LLC, 603 F.3d 327, 335 (6th Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2)). Defendants have conceded that Tsouris can establish a *prima facie* case and have offered an alleged reason for his termination. Thus, to establish a genuine issue of material fact, Tsouris need only produce enough evidence to rebut, but not to disprove, Shaw's proffered rationale. See Blair v. Henry Filters, Inc., 505 F.3d 517, 532-33 (6th Cir. 2007).

As this Court recognized in denying a motion for summary judgment in Ellis v. Rexnord Industries, LLC, 2008 WL 5204076, * 7 (attached to Defendant's Memorandum, Docket Entry No. 31):

> The judge's function at the point of summary judgment is limited to determining whether sufficient evidence has been presented to make the issue of a fact a proper question for the fact finder. The judge does not weigh the evidence, judge the credibility of witnesses, nor determine the truth of the matter. Thus, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for trial - whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of act because they may reasonably be resolved in favor of either party.

See id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 106 S. Ct. 2502, 91 F.Ed.2d 202 (1986).

A significant amount of evidence, including many Shaw documents and the testimony of Jones himself, points to the fact that Tsouris was terminated in retaliation for addressing FLSA overtime and misclassification issues. However, this argument, like Defendants' argument that Tsouris was fired for allegedly refusing to perform a job that was assigned to him on December

8

20, 2007 (despite an email confirming that Jones decided to terminate Plaintiff on *December 19, 2007, a day before the job was even assigned*), are questions for the jury. As such, Plaintiff will address the numerous reasons why this Court must deny Defendant's Motion for Summary Judgment and allow this matter to be heard by a jury.

**ARGUMENT**

A. <u>Genuine Issues of Material Fact Exist as to Pretext</u>

A Plaintiff can demonstrate pretext by showing that the proffered reason for termination "(1) has no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct." <u>See</u> <u>Jones v. Potter</u>, 488 F.3d 397, 406 (6th Cir. 2007). When an employer waits for a legal, legitimate reason to fortuitously materialize, and then uses it to cover up his true, longstanding motivations for firing the employee, the employer's actions constitute "the very definition of pretext." <u>See</u> <u>id</u>.

Plaintiff is able to demonstrate pretext in a variety of ways. First, while Plaintiff's two supervisors, Charles Jones and John Rymer, claim that Tsouris was fired based on his alleged refusal to perform work assigned to him on December 20, 2007, an email sent from Jones to Rymer and Fran Sarvas on December 19, 2007 (attached as <u>Exhibit I</u>) shows that Jones intended to fire Tsouris before this assignment was even given. Plaintiff submits that this fact constitutes the very definition of pretext (and, at a minimum, creates a genuine issue of material fact), as Jones simply waited for an alleged legal, legitimate reason to materialize to cover up his true motivations for firing Tsouris. Second, despite Defendants' claim to the contrary, Plaintiff did not refuse to travel to work at the North Carolina jobsite. Instead, he accepted the assignment that was sent to him on December 20, 2007, and agreed to fly from Pittsburgh to North Carolina to work on the job site, as is documented in an email Tsouris sent to Rymer on December 21,

9

2007. Third, Rymer's refusal to have Shaw reimburse Tsouris for a plane ticket to perform work in North Carolina is inconsistent with the previous practice. Fourth, Jones' claims regarding Tsouris' attitude and performance are refuted by his own written evaluation of Tsouris. Fifth, frustrated with Tsouris' complaints regarding misclassification, Jones sent a message to Tsouris by firing him via email on Christmas Day solely to ruin Tsouris' Christmas.

> 1. <u>The December 19, 2007, "John Tsouris Exit Package" email sent by Charles Jones shows that he intended to fire Plaintiff *before* the event cited for his termination even occurred</u>

Plaintiff was terminated on Christmas Day, 2007. According to both Jones and Rymer, Tsouris was fired for refusing to accept a job assignment that was sent to him on the evening of December 20, 2007. <u>See</u> Jones and Rymer Declarations attached to Defendants' Motion for Summary Judgment; <u>See</u> Jones Depo. at pp. 112-113. Jones testified that his decision to terminate Tsouris came on Christmas Day of 2007. <u>See</u> Jones Depo. at p. 113. Jones also testified that, prior to Christmas Day, *<u>he had not told Rymer</u>* that Tsouris needed to be fired. <u>See</u> Jones Depo. at p. 116.

However, on the morning of December 19, 2007, *before Plaintiff even received this assignment*, Jones wrote an email to Fran Sarvas and John Rymer that states, in part:

> I need an Exit package[3] for John Tsouris…. This individual is causing major conflicts with my team and client schedules.
>
> He is a loose cannon…..

<u>See</u> <u>Exhibit I</u>.

The December 19, 2007 email shows, without question, that Jones decided to fire Plaintiff before the event cited as the reason for his termination had even occurred. When confronted with this email and the fact that it was sent the day *before* the North Carolina job was

---

[3] Jones testified that an exit package is what Shaw will give you if you're "terminating somebody." <u>See</u> Jones Depo. p. 116.

even assigned to Tsouris on December 20, 2007, Jones initially claimed that he thought Tsouris had already refused to go to the job site when he sent the December 19, 2007 "John Tsouris...... Exit Package" email. See Jones Depo. at pp. 118-121. Eventually, however, Jones conceded in his deposition that Tsouris was assigned the North Carolina job on December 20th and that the email he sent regarding his intent to fire Tsouris was dated December 19th, a day before the assignment. See Jones Depo. at pp. 120-121. When asked to explain how his decision to fire Tsouris on December 19th could be based on Tsouris' alleged refusal to accept a job that had yet to even be assigned, Jones responded:

> Well, I can only -- again, *I can only speculate that I pulled and asked for the exit package due to circumstances* with -- with Tsouris. I think the -- day of firing definitely is that, like I said, the straw that broke the camel's back and that action occurred due to his refusal to go to North Carolina.
>
> Backing up to my request for exit papers for the 19th, I can only speculate again, that I'm -- I'm building up to seeing issues with things that maybe are not in these e-mails, other issues we're having with -- with John in reference to this Duke job. That's, and again, I'm -- I'm guessing at that for me to pull and ask for exit papers on the 19th.

Jones Depo. p. 121, ln. 7-19 (emphasis added). When asked to explain what he meant by "circumstances" he was referring to, Jones responded, "Yeah, not that I can recall, not without further investigation of that, I can't recall. I really can't." Jones Depo. p. 121, ln. 20-24.[4]

Based on the existence of the December 19, 2007, email, not to mention Jones' inability to explain these discrepancies, Plaintiff has offered sufficient evidence to rebut Shaw's proffered reasons as to why it purportedly terminated him. Jones waited for an allegedly legal, legitimate reason to fortuitously materialize, and then used it to cover up his true, longstanding motivations

---

[4] Ultimately, opposing counsel attempted to "refresh the recollection" of Jones by handing him a timeline that was prepared by John Rymer. See Jones Depo. at pp. 126-128. When asked by counsel for the Defendant if he remembered the events in the time line, Jones responded, "Yes. I mean, not to the exact, but all the conversations from -- from him talking to -- to Marty Keller at the -- at the -- at the office and yes. Yeah, this is -- okay." See Jones Depo. at p. 127, ln. 20-25. Notably, the timeline referenced was prepared after December 19, 2007, the day Jones sent the "John Tsouris Exit Package" email. See Jones Depo. at p. 130.

11

for firing Tsouris, which was Tsouris' questioning of the overtime and misclassification issue. Shaw's actions constitute "the very definition of pretext." See Jones v. Potter, 488 F.3d 397, 408 (6th Cir. 2007).

  2. <u>Plaintiff did not refuse to travel to work at the North Carolina jobsite</u>

  The fact that Tsouris did not refuse to travel to work at the North Carolina job site, the alleged "legitimate" justification for his termination, also establishes a genuine issue of material fact as to pretext.

  As was previously noted, Rymer sent Tsouris an email on the evening of December 20, 2007, curiously copying Charles Jones, and notifying Tsouris that he needed to be on site in North Carolina on December 27 and 28, 2007. Tsouris responded that he would take an airline flight that Wednesday to complete the assignment in North Carolina, with a rental car in between. See Exhibit J (emphasis added). Nowhere in Tsouris' response does he refuse to take the job that was assigned to him. See Jones Depo. at pp. 99-100; Tsouris Depo. at p. 75.

  Defendants disingenuously contend that "[n]otably, Plaintiff does not dispute that he refused to dispatch to his assigned job in North Carolina, which is why he was terminated." See Defendants' Memorandum in Support of Its Motion for Summary Judgment, at p. 7. However, Tsouris' answer to opposing counsel's questions during his deposition tells a completely different story. Specifically, when asked if he refused to do the work in North Carolina, Tsouris responded by stating: "At no time did I do so." Tsouris Depo. at p. 75, ln. 16-17.

  Since Tsouris testified that he accepted his assignment to travel to North Carolina, and because his email response to the assignment confirms his testimony, at the very least Tsouris has established that there is a genuine issue of material fact as to the purported reason for his

12

termination. This further supports Plaintiff's position that Defendants' purported reason for termination was pretextual.

    3.    <u>Rymer's refusal to pay for Tsouris airfare to a Shaw job is inconsistent with Defendants' previous practice and policy</u>

When John Rymer refused to pay for Tsouris to take a plane to the North Carolina job from Pittsburgh, Tsouris told Rymer that the company had always reimbursed travel expenses and questioned why they wouldn't do it in this instance. <u>See</u> Tsouris Depo. at p. 82. The standard, well-accepted policy of the company was that if you were an employee who happened to be in a personal location or a business location away from the employee's home, the employee could take any method of transport he desired to get to the customer site and the related expense would be reimbursed. <u>See</u> Tsouris Depo. at p. 85. Tsouris had previously been away from home on personal matters when the necessity for business travel came up, and, on those previous occasions Shaw reimbursed his travel expenses without even the need for advanced approval. <u>See</u> Tsouris Depo. at pp. 85, 87-88. It was only after the December 19, 2007 "John Tsouris Exit Package" email that Defendants refused to reimburse the Plaintiff for travel expenses. Thus, Plaintiff is again able to establish a genuine issue of material fact regarding pretext.

    4.    <u>Jones' claim regarding Tsouris attitude and performance is refuted by his own 2007 written evaluation of Tsouris</u>

In Jones' Declaration, he claims that Tsouris "consistently demonstrated a negative, insubordinate and difficult attitude." <u>See</u> Jones Declaration, attached to Defendants' Motion for Summary Judgment. However, Jones' 2007 evaluation of Tsouris tells a completely different story. In the written evaluation, Jones rated Tsouris in the top 15-20% of all employees in the category of ***attitude and cooperation***, the top 15-20% of all employees in the category of dependability, and the top 5-10% of all employees in compliance and ethics. <u>See</u> 2007

13

Employee Performance Management Program Final Review of John Tsouris, Rymer Exhibit No. 1, Jones Exhibit No. 1 (attached as Exhibit L). Jones' current claims that Tsouris consistently demonstrated a negative, insubordinate and difficult attitude are, at best, inconsistent with his own 2007 written evaluation of Tsouris. This inconsistency also establishes a genuine issue of material fact as to pretext.

     5.    <u>Frustrated with constantly dealing with Tsouris' requests for information about being misclassified, Jones sent a message by firing Tsouris via email on Christmas Day</u>

Tsouris complained about being misclassified for years. Frustrated with a lack of response from prior management, he brought it to the attention of a new supervisor, Charles Jones, on August 10, 2007. According to Jones himself, after talking with Tsouris, misclassification and overtime issues were then discussed on a near daily basis.

As evidenced by the December 14, 2007, email sent by Fran Sarvas, Defendants' HR Director, Tsouris had become so frustrated with the failure of Shaw management to make changes to this classification under the FLSA that he threatened to either hire an attorney or go to the Department of Labor. See Exhibit F. Less than a week later, on December 19, 2007, three other important emails were sent. First, Sarvas recognized that "2 employees who are titled Scientist have raised concerns about their title and FLSA status" and that "Management and HR had a discussion with John Tsouris indicating that we would review this matter and get back to him." See Document No. 34-2, at 3 (attached to Defendant's Memorandum in Support of Its Motion For Summary Judgment). Second, Lisa Brandon, a Shaw Vice-President, sent an email approving the reclassification of Tsouris and other employees and mandating that Shaw must "train those involved so that this does not happen again" (see Exhibit H). Third, Charles Jones wrote his "John Tsouris Exit Package" email on December 19, 2007.

14

As of late December of 2007, Jones had been dealing with Tsouris' overtime and misclassification issues for many months and Tsouris was threatening to either hire an attorney or go to the Department of Labor if his complaints regarding overtime and being misclassified were not resolved. Tsouris was the bearer of bad news who "opened the eyes" of Jones (and others) about Shaw's overtime and misclassification issues under the FLSA, and Tsouris was the very reason Jones was having to deal with these issues. Jones was the proverbial "messenger" whom Jones sought to obliterate, having made it clear to Tsouris that he was upset about the fact that Tsouris had raised the overtime issue and commented that he could not afford to pay him if they had to pay him overtime. See Tsouris Depo. at p. 100.

By December 19, 2007, after numerous conferences, emails, and meetings regarding the classification issue initially brought up by Tsouris, upper management at Shaw finally recognized that he was, in fact, misclassified, and mandated that a training program be developed and implemented for the hiring of managers and supervisors to specifically focus on exempt and non-exempt labor categories. It is not only reasonable to infer that both Jones and Rymer were so frustrated with Tsouris' overtime issues that they ultimately cooked-up an allegedly legitimate reason to fire him, it is unreasonable, based upon overwhelming evidence to the contrary, to infer otherwise. Instead of firing Tsouris on December 19th and trumping up other concocted reasons, or firing him any other day in late December or early January, Jones purposely chose to fire Tsouris on Christmas Day in order to exact revenge on Tsouris for initiating the reclassification of field technicians.

Jones spent Christmas Day with his family, opening up presents under the tree. See Jones Depo. at pp. 111-12. Having spent a tremendous amount of time on issues regarding Tsouris' misclassification and overtime, he had recently been informed by management that

15

Tsouris was ultimately correct and that employees under Jones' supervision technicians were misclassified and owed overtime. On that Christmas Day, Jones knew that Shaw would see a reduction in profits related to the expenses it would have to incur to right the wrong and pay his employees overtime. He also knew that he would have to work even more on this issue, as there was going to be a new training program used to focus on issues of exempt and non-exempt technicians. Having previously stated to Tsouris ***that he didn't like that Tsouris was pushing him over the overtime issue and that he was going to push back*** (see Tsouris Depo. at p. 101) he decided that it was the perfect time to display his power and show Tsouris that Shaw would have the last word. On Christmas Day of 2007, the message Jones sent John Tsouris was clear: "I told you not to push back on overtime issues."

B.  This Court has denied summary judgment on this very issue on a much weaker ground

Plaintiff contends that, for the reasons previously addressed in this response, it is clear that Defendants' Motion for Summary Judgment should be denied. However, should there be any question as to why this Court must deny Defendants' Motion, Plaintiff points this Court's attention to the case of Taylor v. City of Gatlinburg, 2008 U.S. Dist. Lexis 75708 (E.D. Tenn. August 26, 2008) (attached as Exhibit M).

In Taylor, the Plaintiff began working for the Gatlinburg Fire Department in 1977. See id. at * 2. In **1989**, he and nine other employees filed suit against the Defendant under the FLSA. See id. In May of 2002 a performance improvement plan was issued to the Plaintiff, and in March of 2004, a Disciplinary Action was issued "on the grounds of severe lack of communication and supervision as well as failure to address problems on the shift" the Plaintiff supervised. See id. The Plaintiff did not appeal or challenge the Disciplinary Action and was suspended without pay for 64 hours and placed on six months probation. See id. In 2005,

16

Plaintiff applied for a job vacancy as the Fire Chief and was not recommended for the position based on the review committee's review of the Plaintiff's personnel file. See id. at *4. Despite the fact that the FLSA lawsuit was filed 15 years previously, Plaintiff was able to present evidence that he had the most supervisory and training experience of all applicants and that the 1989 law suit was still on the mind of the decision maker who was to hire the new Fire Chief. See id. at * 9-10. The Court found that "the plaintiff has submitted evidence which, viewed in the light more favorable to the plaintiff, could convince a jury that the motivation for the adverse employment action was the plaintiff's participation in the 1989 FLSA lawsuit," rejected Defendant's argument that the Plaintiff's application was denied because of the 2002 performance improvement plan and the 2004 Disciplinary Action, and denied Defendant's Motion for Summary Judgment. See id. at *10-11.

Plaintiff contends that, while correct, the Court's decision in Taylor was made on much weaker and far fewer grounds than the multiple grounds provided by Plaintiff in the case at hand. As previously noted, a significant amount of evidence, including many Shaw documents and the testimony of not only the Plaintiff, but Jones himself, can point a jury to the conclusion that Tsouris was terminated in retaliation for addressing FLSA overtime and misclassification issues. Defendants' argument that Plaintiff was fired for allegedly refusing to perform a job that was assigned to him on December 20, 2007 (despite an email confirming that Jones decided to terminate Plaintiff on December 19, 2007, a day before the job was even assigned and the numerous other facts brought to light in Plaintiff's Response to Defendant's Motion for Summary Judgment) is a question for the jury. As such, this Court must deny Defendants' Motion for Summary Judgment.

17

## CONCLUSION

The evidence is not so one-sided that Defendants should prevail as a matter of law. As such, this Court must deny Defendants' Motion for Summary Judgment (Docket Entry No. 30-31) and allow this matter to be heard before a jury.

Respectfully Submitted,

DICKINSON WRIGHT, PLLC

By: s/Robert C. Bigelow
M. Reid Estes, # 009043
Robert C. Bigelow, #22022
Fifth Third Center, Suite 1401
424 Church Street
Nashville, Tennessee 37219
(615) 244-6538

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a true and exact copy of the foregoing has been served via the Court's electronic filing system or U.S. Mail, first class, postage pre-paid mail on:

William S. Rutchow
Jennifer S. Rusie
OLGETREE, DEAKINS, NASH, SMOAK & STEWART
SunTrust Plaza, Suite 1200
401 Commerce Street
Nashville, TN 37219
(615) 254-1900
Fax: (615) 254-1908
william.rutchow@odnss.com
jennifer.rusie@odnss.com

Attorney for Defendants The Shaw Group, Inc.
and Shaw Environmental, Inc.

on this the 28th day of February, 2011.

NASHVILLE 38719-2 404309v1

18

Case 3:09-cv-00522-TAV-CCS   Document 35   Filed 02/28/11   Page 18 of 18   PageID #: 234